## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
#### (Eastern Division)

| | |
|---|---|
| In re:<br><br>**TRANS NATIONAL COMMUNICATIONS INTERNATIONAL, INC.,**<br><br>Debtor. | **Chapter 11**<br><br>**Case No. 11-19595-WCH** |

**MOTION FOR (1) THE INTERIM AND PERMANENT USE OF CASH COLLATERAL, (2) THE APPROVAL OF AGREEMENT REGARDING THE USE OF CASH COLLATERAL, (3) THE GRANTING OF REPLACEMENT LIENS, (3) THE ENTRY OF SCHEDULING ORDER REGARDING CONTINUED USE OF CASH COLLATERAL AND (4) ADDITIONAL RELIEF**
*(Emergency Determination Requested)*

Pursuant to Sections 105 and 363 of the United States Bankruptcy Code (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 2002, 4001, and 9014, and MLBR 4001-2, Trans National Communications International, Inc. (the "Debtor"), the debtor and debtor-in-possession, move the Court for the entry of an order authorizing the use of Cash Collateral (as defined below) to maintain the value of the Debtor's property through continued operations in the ordinary course of business. Subject to the approval of the Court, the Debtor has reached an agreement with the two creditors holding liens on its assets (including Cash Collateral), RBS Citizens, N.A., successor by merger to Citizens Bank of Massachusetts ("Citizens"), and Charlesgate West Management, Inc. ("CWM," and together with Citizens, the "Secured Creditors"), for the use of Cash Collateral. The agreement to the use of Cash Collateral is reflected in a proposed interim cash collateral order (the "Proposed Cash Collateral Order"), a copy of which is attached as Exhibit A. Pursuant to MLBR 4001-1(d), a description of the Proposed Cash Collateral Order is set forth below.

The Debtor requests:

(i)    The entry of an interim order authorizing the use of Cash Collateral, in accordance with the terms of the Proposed Cash Collateral Order, on an emergency basis in an amount necessary to avoid immediate and irreparable harm;

(ii)   The approval of the agreement for the use of Cash Collateral between the Debtor and the Secured Creditors and the entry of a permanent order authorizing use of Cash Collateral;

(iii)  The granting replacement liens to the Secured Creditors to the extent described in the Proposed Cash Collateral Order; and

(iv)   The entry of an Order setting a final hearing date on the continued use of Cash Collateral.

The Debtor's principal business is the reselling of voice and data telecommunications services to small and medium sized businesses. The Debtor provides voice and data telecommunication services to over 18,000 customers. The Debtor requires the use of Cash Collateral to continue its operations while it reorganizes. Immediate relief is necessary to prevent any interruption in the Debtor's business and in the voice and data services provided to the Debtor's customers.

The primary terms of the Proposed Cash Collateral Order include the following:

| Authorization for use of Cash Collateral | The Debtor is authorized to continue its use of the Secured Creditors' Cash Collateral during the period from the Petition Date through and including 5:00 p.m. (ET) on  October 28, 2011 (the "First Interim Period"), in accordance with the Budget attached hereto and made a part of the Proposed Cash Collateral Order as Exhibit "A"; provided that, the Debtor shall be entitled to exceed the amounts set forth in the Budget by up to 10%, calculated on a cumulative basis, during the First Interim Period. Anything herein to the contrary notwithstanding, in no event shall the Debtor use any of the Secured Creditors' Cash Collateral: |
| --- | --- |
| | i.    To pay any items not contained in the First Interim Budget, except (x) after written request to the Secured Creditors and receipt by the Debtor of the Secured Creditors' written consent, or (y) as may be approved by the Court after notice to the Secured Creditors and the opportunity to be heard at a hearing held by the Court; or |

| | |
|---|---|
| | ii.      In a manner that is otherwise inconsistent with the terms and provisions of the Proposed Cash Collateral Order. |
| Modification of use of Cash Collateral | The Debtor and Secured Creditors may agree from time to time to modify the Budget in the discretion of the Secured Creditors and without further order of the Court.  In the event the Debtor and Secured Creditors agree to modify the Budget, the Debtor shall provide notice of the Proposed Cash Collateral Order to any statutory committee (if any), the U.S. Trustee, and such other parties as shall be entitled to notice of the Proposed Cash Collateral Order under Bankruptcy Rule 4001; _provided_, _however_, the Debtors' Cash Collateral usage during the First Interim Period shall not exceed $3,850,983 in the aggregate. |
| Termination of use of Cash Collateral | Unless sooner terminated in accordance with the terms of the Proposed Cash Collateral Order, the Debtor's right to use the Secured Creditors' Cash Collateral shall terminate ("_Termination_") at 5:00 pm (prevailing eastern time) on October 28, 2011.  Upon Termination, the Debtor shall immediately cease using the Secured Creditors' Cash Collateral; however, nothing herein shall be deemed a waiver of (x) the Debtor's right to seek authority to continue its use of the Secured Creditors' Cash Collateral beyond the Termination, in accordance with §§ 361 and 363 of the Bankruptcy Code, or (y) the right of the Secured Creditors to object thereto. |
| Debtor's acknowledgment of indebtedness and stipulations<br><br>**These provisions may deviate from MLBR 4001-2(c).** | Subject to Paragraph 5 of the Proposed Cash Collateral Order and the entry of a Final Order (as it may be amended or modified by the Secured Creditors and the Debtor) and the Budget, the Debtor hereby acknowledges and agrees that:<br><br>a)   <u>Citizens' Pre-Petition Revolving Line of Credit</u>.<br><br>    i.    Citizens asserts, and subject to Section 5 of the Proposed Cash Collateral Order, the Debtor stipulates that as of the Petition Date the Debtor is indebted to Citizens pursuant to, <u>inter alia</u>, the Citizens' Pre-Petition Loan Documents.<br><br>    ii.   Citizens asserts, and subject to Section 5 of the Proposed Cash Collateral Order, the Debtor stipulates that as of October 7, 2011, the Debtor is liable to Citizens in respect of the Obligations (as defined in the Citizens' Pre-Petition Loan Documents) arising under and pursuant to the Citizens' Pre-Petition Loan Documents in the amount of $4,307,932, _plus_ such other interest accruing from and after such date under the Citizens' Pre-Petition Loan Documents, _plus_ all fees, costs, expenses, and costs of collection (including, without limitation, reasonable attorneys' fees) as set forth in the Citizens' Pre-Petition Loan Documents, heretofore or hereafter incurred by Citizens in connection therewith (the "<u>Citizens' Revolving Line of Credit Claim</u>"), to the extent allowable by the Court pursuant to § 506(b) of the Bankruptcy Code and subject to the rights of |

| | |
|---|---|
| | the Debtor to contest under § 506(b) of the Bankruptcy Code the allowance or payment of those amounts to Citizens (the "<u>506(b) Rights</u>"); and |
| **These provisions may deviate from MLBR 4001-2(c).** | b)   <u>Citizens' Pre-Petition Security Interests.</u>   Citizens asserts, and subject to Section 5 the Proposed Cash Collateral Order, the Debtor stipulates that Citizens' Revolving Line of Credit Claim is secured by valid, perfected, and unavoidable first priority liens and security interests in, on and upon the Collateral (as defined in the Citizens' Pre-Petition Loan Documents), and shall constitute an allowed secured claim pursuant to §§ 506(a) and (b) of the Bankruptcy Code for all purposes in connection with the Debtor's Chapter 11 case. |
| **These provisions may deviate from MLBR 4001-2(c).** | c)   <u>Waiver of Claims/Lien Challenges.</u> |
| | i.   Subject to Section 5 the Proposed Cash Collateral Order, the Debtor hereby acknowledges and agrees that the Debtor has no offsets, defenses, claims, or counterclaims against Citizens, or Citizens' officers, directors, employees, attorneys, representatives, parent, affiliates, predecessors, successors, or assigns, with respect to the pre-petition indebtedness due and owing to Citizens, or otherwise, and that if the Debtor now has, or ever did have, any offsets, defenses, claims, or counterclaims against Citizens, or its officers, directors, employees, attorneys, representatives, parent, affiliates, predecessors, successors, or assigns, whether known or unknown, at law or in equity, from the beginning of the world through this date, all of them are expressly WAIVED, and the Debtor RELEASES Citizens and its respective officers, directors, employees, attorneys, representatives, parent, affiliates, predecessors, successors, and assigns from any liability therefor. |
| | ii.   Subject to Section 5 the Proposed Cash Collateral Order, any and all challenges by the Debtor (a) to the validity, sufficiency, priority or amount of the Citizens' Revolving Line of Credit Claim; (b) the perfection of Citizens' security interests and liens in the Collateral, as and to the extent applicable; and (c) any and all transfers received by Citizens prior to the Petition Date with respect to the Citizens' Revolving Line of Credit Claim, including, but not limited to, claims or challenges pursuant to §§ 506(c), 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code, shall be forever barred. |
| | iii.   The Debtor reserves all of its rights with respect to the rights of, or the Debtor's obligations to, CWM pursuant to CWM's Pre-Petition Loan Documents. |
| Adequate Protection | a)   <u>Post-Petition Replacement Liens.</u> |
| | i.   The Secured Creditors are hereby granted replacement liens |

(collectively, the "Replacement Liens"), not to exceed the value of their respective Cash Collateral used during the First Interim Period, to the extent of the amount of the Citizens' Revolving Line of Credit Claim (and the amount of the claim of CWM with respect to CWM as and to the extent applicable) less any post-petition reductions in the Citizens' Revolving Line of Credit Claim (as provided herein), as and to the extent applicable, exceeds the value of the pre-petition Collateral (as agreed to by the Secured Creditors and Debtor, or as determined by the Court), in all of the Debtor's pre-petition and post-petition assets of every kind, nature, and description, tangible and intangible, now existing or hereafter arising, including, but not limited to, all contracts, all accounts, inventory, equipment, general intangibles, goods, motor vehicles, real estate, and leasehold interests, as well as all products and proceeds of the Proposed Cash Collateral Order (collectively, the "Post-Petition Collateral"). The post-petition grant of the foregoing security interests shall be supplemental to and in addition to, the security interest which each Secured Creditor possesses pursuant to Citizens' Pre-Petition Loan Documents and CWM's Pre-Petition Loan Documents, respectively.

ii.   The Replacement Liens granted to the Secured Creditors pursuant to the Proposed Cash Collateral Order shall be prior and senior to all liens and encumbrances of (a) all other secured creditors in and to such property granted, or arising, subsequent to the date of the Proposed Cash Collateral Order (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor other than taxes); and (b) any intercompany claim of the Debtor, or any parent, subsidiary or affiliate of the Debtor; and (c) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtor's estate pursuant to § 551 of the Bankruptcy Code; provided, however, (x) that the Replacement Liens granted to the Secured Creditors pursuant to the Proposed Cash Collateral Order: (1) shall be subject, during the First Interim Period, to a carveout for any quarterly or other fees payable to the United States Trustee pursuant to, inter alia, 28 U.S.C. § 1930(a) (the "UST Fee Carve Out"); (2) shall not attach to any claims for relief under Chapter 5 of the Bankruptcy Code or the proceeds of the Proposed Cash Collateral Order (other than claims arising under section 549 of the Bankruptcy Code); and (3) subject to the CWM Subordination Agreement (defined below), shall not prime any valid, perfected, and non-avoidable pre-petition lien held by, or granted to, any other party; and (y) that CWM's liens pursuant to CWM's Pre-Petition Loan Documents and CWM's Replacement Liens shall also be subject to a carveout (together with the UST Fee Carveout, the "Carveout") for (1) the reasonable fees and expenses

| | | |
|---|---|---|
| | | incurred by any trustee appointed by the Court, not to exceed $25,000 in the aggregate; and (2) the reasonable fees and expenses incurred by professionals and agents retained by the Debtor and any statutory committee, in an aggregate amount not to exceed $300,000. |
| **These provisions may deviate from MLBR 4001-2(c).** | iii. | The Replacement Liens granted pursuant to the Proposed Cash Collateral Order shall constitute valid and duly perfected security interests and liens, and the Secured Creditors shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtor to execute any documentation relating to the Replacement Liens shall in no way affect the validity, perfection or priority of such replacement liens. If, however, the Secured Creditors, in their sole discretion, shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Replacement Liens, the Debtor is directed to cooperate with and assist in such process, the stay imposed by § 362(a) of the Bankruptcy Code hereby is lifted to allow the filing and recording of a certified copy of the Proposed Cash Collateral Order or any such financing statements, notices of lien or similar instructions, and all such documents shall be deemed to have been filed or recorded at the time and date of the Proposed Cash Collateral Order. |
| **These provisions may deviate from MLBR 4001-2(c).** | iv. | The Replacement Liens will be first in priority if no other valid or non-avoidable pre-existing lien(s) exist on the subject Post-Petition Collateral, and junior in priority if valid and non-avoidable pre-existing lien(s) do exist on the subject Post-Petition Collateral. The Replacement Liens granted to the Secured Creditors herein may not be primed by any other lien or encumbrance, except by order of the Court pursuant to, and within the meaning of, §§ 364(d)(l) and (d)(2) of the Bankruptcy Code. All rights of the Secured Creditors to object to any priming are expressly reserved. |
| **These provisions may deviate from MLBR 4001-2(c).** | v. | The Replacement Lien(s) and security interests created herein shall continue in full force and effect until the Citizens' Revolving Line of Credit Claim and the obligations owed to CWM pursuant to CWM's Pre-Petition Loan Documents have been indefeasibly paid in full in cash, including all principal and, to the extent authorized by the Court pursuant to § 506(b) of the Bankruptcy Code, such interest, fees, costs, and expenses, including reasonable attorneys' fees, whether currently existing or hereafter accrued and incurred, as provided for by the applicable documents. Except as otherwise provided herein, the liens and security interests granted and created herein and the |

| | |
|---|---|
| | priorities of same shall not be affected by the incurrence of indebtedness pursuant § 364 of the Bankruptcy Code, or otherwise. |
| Post-petition interest | As additional adequate protection, the Debtor, without further order of or application to the Court, stipulates and agrees to the payment of post-petition interest on and after the Petition Date with respect to the Citizens' Revolving Line of Credit Claim at the contractual default rate set forth in the applicable Citizens' Pre-Petition Loan Documents, subject to the Debtor's 506(b) Rights. Notwithstanding any provision of the Proposed Cash Collateral Order or Citizens' Pre-Petition Loan Documents to the contrary, Citizens' reserves, and the Proposed Cash Collateral Order is without prejudice to Citizens' rights to, among other things, claim additional interest, fees and expenses (including, without limitation, professional fees and expenses) in an amount greater than the amounts provided for in the Proposed Cash Collateral Order. |
| Citizens' post-petition costs and expenses | As additional adequate protection, and without further order of or application to the Court, the Debtor is directed and authorized to pay the post-petition out-of-pocket costs and expenses incurred by Citizens (including, without limitation, reasonable fees and expenses of counsel; any dispute as to the reasonableness of such fees shall be subject to the jurisdiction of this Court), with any such payment to be made 15 days after submission of a reasonably detailed invoice to Debtor, Debtor's counsel, the U.S. Trustee and counsel for any statutory committee and in accordance with such payment instructions as shall accompany any such invoice, provided no objection has been raised by any party, in which case, the amounts that have not been objected to shall be paid after the 15 days and the dispute with regard to amounts objected to shall be resolved by the Court. Notwithstanding any provision of the Proposed Cash Collateral Order or Citizens' Pre-Petition Loan Documents to the contrary, the Proposed Cash Collateral Order is without prejudice to (i) the Debtor's 506(b) rights; and (ii) Citizens' rights to, among other things, claim fees and expenses (including, without limitation, professional fees and expenses) in an amount greater than the amounts provided for in the Proposed Cash Collateral Order. Nothing contained herein shall be deemed to be a waiver by any party in interest, including any statutory committee, of the right to object to the reasonableness of any fees, costs and charges incurred by Citizens; nothing in this Order shall affect the right of any party in interest (other than the Debtor) to assert that any payments authorized under the Proposed Cash Collateral Order should be recharacterized as a payment on account of the principal amount of Citizens' pre-petition obligations outstanding as of the Petition Date. |
| Superpriority claims | To the extent that the Replacement Liens and adequate protection payments provided for in the Proposed Cash Collateral Order are insufficient to provide adequate protection for the Secured Creditors, the Secured Creditors are hereby granted allowed superpriority claims against the Debtor's estate pursuant to § 507(b) of the Bankruptcy Code (the "Secured Creditors' Superpriority Claims"). |

| | |
|---|---|
| Payment of principal | As additional adequate protection, and subject to Section 5 of the Proposed Cash Collateral Order, during the Chapter 11 case, Citizens is hereby authorized to apply Excess Cash Collateral, if any, as a permanent, partial principal reduction and payment toward the Citizens' Revolving Line of Credit Claim. For purposes of the Proposed Cash Collateral Order, "Excess Cash Collateral" shall mean (i) the amount by which the average aggregate cash balance in the Debtor's accounts exceeds $1,800,000 for any rolling three week period (such three week period, the "Measurement Period"). The first Measurement Period shall conclude with the week ending November 18, 2011. |
| Creditors' Committee; Claims/lien challenge period | a)    The provisions of the Proposed Cash Collateral Order are without prejudice to the rights of the U.S. Trustee to appoint a statutory committee(s), or any rights of a duly appointed committee to challenge the validity, priority or extent of any lien(s) asserted against Cash Collateral, subject to the provisions of the Proposed Cash Collateral Order and subparagraphs (b) and (c) below.<br><br>b)    Notwithstanding the provisions of Paragraph 3 above, any subsequently appointed statutory committee, any successor trustee or any other party in interest with requisite standing claiming by, through or under the Debtor, other than the Debtor, may file an objection to the amount of the Citizens' Revolving Line of Credit Claim, or file (or seek authority to file, as the case may be) a complaint on behalf of the estate under §§ 544, 547, 548, 549, 550, or 553 of the Bankruptcy Code, inter alia, challenging the validity, priority, or extent of Citizen's security interests in the Collateral, or otherwise seeking to avoid or recover any transfers received by Citizens with respect to the Citizens' Revolving Line of Credit Claim. Any such objection or complaint (as is applicable) shall set forth the basis for the objection or complaint, and the reason why the Citizens' Revolving Line of Credit Claim should not be allowed in full. If no such objection or complaint (as is applicable) is filed: (i) by a statutory committee on or before sixty (60) days after the appointment thereof, or (ii) by a trustee on or before forty-five (45) days following the date of entry of a Final Order (as applicable, the "Challenge Period"), any and all challenges by any party to the Citizens' Revolving Line of Credit Claim, Citizens' security interests or liens against the Collateral, and/or transfers received by Citizens in respect of the Citizens' Revolving Line of Credit Claim, as and to the extent applicable, including, but not limited to, those under §§ 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code (including, without limitation, any such challenge or any such claim as described herein including, but not limited to, claims seeking to subordinate or recharacterize Citizens' claims or liens), shall be forever barred. The Challenge Period may only be extended with the written consent of Citizens, or by order of the Court.<br><br>c)    The Citizens Cash Collateral may not be used in connection with: (i) objecting, challenging, litigating, opposing, or seeking to subordinate or recharacterize in any way any claims or liens held by or on behalf of |

| | |
|---|---|
| | Citizens; (ii) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against Citizens, or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; and/or (iii) prosecuting an objection to, or contesting or opposing in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, character or enforceability of any of Citizens' claims or liens, including, without limitation, the Replacement Liens; provided, however, during the Challenge Period a statutory committee, if appointed, may use Citizens Cash Collateral, in an amount not to exceed $25,000 in the aggregate, for allowed fees and expenses incurred solely in investigating (but not objecting to, challenging, litigating, opposing, or seeking to subordinate or recharacterize) the validity, enforceability, perfection, priority, character or extent of Citizens' claims or liens, including, without limitation, the Replacement Liens. |
| Default; Termination of Cash Collateral usage | The Debtor shall be prohibited from using the Secured Creditors' Cash Collateral absent further order of this Court upon either Secured Creditor having first notified the Debtor, any statutory committee(s) (as and to the extent applicable), and the U.S. Trustee in writing that an Event Of Default has occurred and is continuing. For purposes of the Proposed Cash Collateral Order, an "Event Of Default" shall occur if (a) the Debtor fails to use Cash Collateral in compliance with the Budget, (b) any representation or warranty made by the Debtor under the Proposed Cash Collateral Order, or any pleading, certificate, report or financial statement delivered to the Secured Creditors in this Chapter 11 case proves to have been false or misleading in any material respect as of the time when made or given (including by omission of material information necessary to make such representation, warranty or statement not misleading), (c) without the prior written consent of the Secured Creditors, the appointment of a Chapter 11 trustee or examiner with duties in addition to those set forth in §§ 1106(a)(3) and (a)(4) of the Bankruptcy Code, (d) the Debtor's Chapter 11 case is converted to a case under Chapter 7, (e) without the prior written consent of the Secured Creditors, the Debtor shall file a motion seeking to grant a third party a security interest or lien upon all or part of any property of the Debtor that has a priority which is senior to, or equal with, the Secured Creditors' pre-petition liens or the Replacement Liens in all or any of a portion of such property, (f) the Debtor shall fail to furnish to the Secured Creditors the financial reporting required under Paragraph 11 of the Proposed Cash Collateral Order, (g) the Debtor shall fail to provide the Secured Creditors with the access provided for under Paragraph 13 of the Proposed Cash Collateral Order, (h) without the prior written consent of the Secured Creditors, the grant by the Court of a motion for relief from the automatic stay in favor of any party, other than the Secured Creditors, with respect to any portion of the secured Creditors' Collateral (including, but not limited to, any Cash Collateral) with value greater than $100,000, (i) reversal, vacatur, or reconsideration of the Proposed Cash Collateral Order by the Court or any appellate court, or (j) without the prior written consent of the Secured Creditors, there is filed by the Debtor any motion to amend or modify the terms of the Proposed Cash Collateral Order; provided, however, to the extent the alleged Event Of Default is a payment default or |

| | |
|---|---|
| | otherwise susceptible to cure, the Secured Creditors shall provide the Debtor and Debtor's counsel with written notice of the Proposed Cash Collateral Order and five (5) days' opportunity to cure such default. If the Secured Creditors believe that the Debtor has used its Cash Collateral in a manner not consistent with the Proposed Cash Collateral Order and/or the Budget, and/or fails to provide the Secured Creditors with financial information as requested or with the access as provided herein, the Secured Creditors shall be permitted to seek relief, including, without limitation, termination of the Debtor's use of Cash Collateral, on an emergency and/or expedited basis. Upon Termination of the Debtor's right to use Cash Collateral pursuant to the terms of the Proposed Cash Collateral Order, nothing in the Proposed Cash Collateral Order shall be deemed to waive the right of the Debtor or any successor thereto, to bring a motion requesting that this Court authorize the use of Cash Collateral over the objection of the Secured Creditors' or any parties' rights to contest any such motion. |
| No marshaling | The Secured Creditors shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral (whether pre-petition or post-petition). Additionally, upon entry of a Final Order the Secured Creditors shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Secured Creditors with respect to proceeds, product, offspring or profits of any of the Collateral, to the extent such relief is granted. |
| Financial Reporting | The Proposed Cash Collateral Order requires the Debtor to provide weekly financial reporting, including: <br><br> i. A report showing the Debtor's cash receipts and disbursements for the immediately preceding weekly period covered by the Budget, as well as a report showing any and all variances (on a line item basis, whether a positive or negative variance); <br><br> ii. A rolling updated 13-week cash flow forecast and budget; <br><br> iii. Any financial information and pleadings filed with the Court shall be served upon the Secured Creditors and their counsel simultaneously with the filing of such information or pleading with the Court; <br><br> iv. Al other financial information and reports prepared by the Debtor in the ordinary course of its business, including any financial information required by the Court or by any applicable operating guidelines and/or reporting requirements of the U.S. Trustee; subject, however, to any applicable attorney-client and/or work-product privileges; and <br><br> v. All other reports and financial information required to be provided to the Secured Creditors by Citizens' Pre-Petition Loan Documents or CWM's Pre-Petition Loan Documents or historically provided to the Secured Creditors, at such times and in the form customarily |

| | |
|---|---|
| | provided, and any additional reports as may be reasonably requested by the Secured Creditors from time to time. |
| Restructuring Plan | As a condition to Citizens' consent to the Debtor's use of Cash Collateral in the manner and for the periods provided herein, the Debtor hereby agrees that, prior to November 1, 2011, the Debtor shall file an application to employ a financial advisor and/or investment banker reasonably acceptable to Citizens to assist the Debtor in exploring various reorganization strategies. By no later than November 8, 2011, the Debtor shall make such financial advisor and/or investment banker available to Citizens to discuss the Debtor's restructuring strategies and alternatives, and the Debtor the Debtor shall thereafter continue to make such financial advisor and/or investment banker reasonably available to Citizens. |
| Without prejudice | The Proposed Cash Collateral Order is without prejudice to: (a) any subsequent request by a party in interest (including, but not limited to the Secured Creditors) for modified adequate protection or restrictions on use of Cash Collateral; or (b) any other right or remedy which may be available to the Secured Creditors. |
| CWM Intercreditor/Subordination Agreement | Any and all rights granted to CWM and provided for under the Proposed Cash Collateral Order shall, in all respects, be subject to that certain Subordination Agreement, dated October 6, 2010, by and among Citizens, CWM and the Debtor, as same may have been amended and as presently in effect (the "CWM Subordination Agreement"); provided however, notwithstanding anything in the CWM Subordination Agreement to the contrary, Citizens shall not oppose CWM subordinating its liens for the purposes of facilitating the satisfaction of the Debtor's obligations under Section 366 of the Bankruptcy Code; provided that any such Section 366 plan shall be subject to Citizens prior approval and consent, such approval and consent not to be unreasonably withheld. |

In further support of this motion, the Debtor avers as follows:

## I.   BACKGROUND

1.     On October 9, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code ("Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Court").

2.     The Debtor continues to operate as a debtor in possession pursuant to Sections 1107 and 1108 of the Code. As of the date of this motion, no official committee of creditors has been appointed.

A.    **The Debtor.**

3.    The Debtor is a Delaware corporation founded in 1995.  The Debtor is

headquartered in Boston, Massachusetts, where it employs 86 of its 98 total employees.

4.    As a telecommunications reseller for over 16 years, the Debtor provides local and

long distance phone services as well as data communication services (primarily viewed as

telephone and internet services) to small and medium sized businesses throughout the United

States.  In order to effectively deliver such services, the Debtor purchases services in high

volume from larger telecom network carriers such as Sprint, Qwest (CenturyLink), AT&T,

Verizon and numerous others (collectively, "underlying carriers") and engineers solutions

utilizing the services of one or more of these underlying carriers in order to provide individual

end-user customers with competitive solutions to meet their communications services needs.

The Debtor generates revenue and profit from the sale and monthly billing of these services to

the end-user customers.  The Debtor supports the processing of over 150+ million phone calls

each month and provides voice and data communication services for over 18,000 customers'

service connections, issuing monthly invoices for approximately 25,000 billing locations.

5.    The Debtor establishes and manages contracts with each of its underlying carriers

and relies upon contractual terms with these underlying carriers in order to enable it to provide

service to end-user customers that are typically contracted for over 1-2 year periods and are

frequently renewed and extended for additional annual periods.  Underlying carrier programs and

networks are selected for use with individual end-user customers based upon such considerations

as the geographic location of the end-user customer, the specific services and features required

by the end-user and the alignment of these needs with the specific services offered by individual

underlying carriers.  Each end-user customer location requires that an individual connection be

engineered and installed between the end-user customer's location and the underlying carrier

network.  To a lesser extent and since 2009, the Debtor has built its own network so that

customers may connect to switching facilities leased by the Debtor where connections to all

underlying carriers are made available for the routing of voice and data communications

services.  Whether directly to an underlying carrier or to the Debtor's switching facilities, each of

these connections requires approximately 30 days to plan, configure and coordinate, followed by

30-60+ days to install, test and fully implement for the end-user customers' use.

     6.    From its founding through 2007, the Debtor generated a positive net income from

operations for each year.  Thereafter, its revenues, EBITDA, pre-tax income and net income are

as follows:

| *Dollars in Thousands* | | | |
|---|---|---|---|
| | **2008** | **2009** | **2010** | **Through August 31, 2011**[*] |
| **Revenues** | 66,370 | 79,372 | 84,302 | 51,699 |
| **EBITDA** | 3,567 | 3,505 | 2,871 | (52) |
| **Pre-Tax Income** | 1,560 | 1,078 | (4,790) | (2,129) |
| **Net Income** | 1,419 | 947 | (4,892) | (2,129) |

[*Numbers are preliminary.]

**B.**    **Events Precipitating The Bankruptcy Filings.**

     7.    Since its inception in 1995, the Debtor has maintained contracts and service

relationships with a number of underlying carriers, and in many cases, the Debtor has maintained

individual carrier relationships for over 10 years.  Over this period as communication services

have become more complex, financial pressures on the underlying carriers have resulted in

declining levels of support being provided by underlying carriers.  Engineering and back-office

service coordination support as well as the monitoring of ongoing services to prevent fraud have

been reduced or eliminated by underlying carriers, resulting in the Debtor's need to expand and

increase the support services it provides directly, at significant cost to the Debtor, to meet the needs of individual end-user customers.

8.    As the number of end-user customers and the volume of services have increased, contracts with underlying carriers have expanded in scope to accommodate this growth as well as to include new and ever-increasing technology advances in the services provided. This increase in size and complexity also has resulted in increased risks of errors on the part of the underlying carriers. Over time, the complexity of services provided has resulted in literally millions of individual contractual cost elements being established to enable the accurate billing of a single customer's monthly services. The amount of time and effort required by the Debtor and the underlying carriers to analyze billing detail has increased proportionately with the increase in billing complexity. As the Debtor analyzes bills rendered by underlying carriers, it submits to the underlying carriers disputes or claims that include itemized detail for incorrect bills. Disputes that historically may have been resolved within 1-2 months from discovery now often require 6 or more months to resolve and then even longer before credit is provided to the Debtor. As the time to resolve these disputes has increased, the financial impact has similarly increased and the willingness of underlying carriers to accept financial responsibility for contractual errors and provide credits to the Debtor has decreased.

9.    Historically, even the most contentious billing disputes were reviewed, negotiated and resolved, and credits applied within the same fiscal year that the dispute had been identified. Since 2009, this process has slowed, resulting in credits accumulating without gaining resolution within even a one-year period. The disputed amounts continue to increase and, due to the growing financial impact of these disputed amounts, some of the largest underlying carriers have refused to even meet and review disputes, opting instead to offer de minimus settlements to

resolve such matters.  When the Debtor has attempted to negotiate such settlement offers, the response of the underlying carrier has been to demand that the Debtor accept and close these matters or be subjected to penalties such as unreasonable security deposits, rate hikes or refusal to accept and process new business.  For example, although the Debtor complied with its carrier service agreement, one large underlying carrier threatened to assess a rate hike of nearly 300% or arbitrarily block a key end-user customer's usage in an attempt to prevent the Debtor from keeping that usage with the underlying carrier and earning contracted credits from that carrier. Based on having tens of thousands of employees and control over the operational and financial aspects of the relationships, the underlying carriers have been able to force the Debtor to accept unreasonable resolutions or be forced to accept additional financial burden where the only option would be to undertake the manual process of migrating individual end-user customers away from an uncooperative underlying carrier and to establish individual connections at another underlying carrier.

10.    Due in part to the carriers' new posture on the disputed billing charges and credits, in 2010 the Debtor's auditors informed the Debtor that it would have to write-off in excess of $4.8 million of what the Debtor considered to be fully accurate underlying carrier billing disputes that had accrued primarily in 2009 and 2010.  The write-off was done for accounting purposes only, and the Debtor has not waived the right to continue to dispute the billing charges and credits at issue.  In addition to the $4.8 million of billing disputes written off in 2010, the Debtor has other billing disputes of nearly $4.4 million, and the Debtor intends to address the combined $9.2 million in billing disputes with its carriers.

11.    As a result of the accounting write-off of $4.8 million in disputed billing charges and credits, the Debtor books reflected a loss in 2010.

12.     The Debtor faces a grave financial impact from its underlying carriers passing on unsubstantiated rate increases.  In several instances, the Debtor has received rate hikes of more than 25% from its underlying carriers.  These rate hikes were not assessed to direct end-user customers of the underlying carriers but rather only to wholesale customers such as the Debtor who were physically unable to react quickly enough to migrate business.  The Debtor has been forced to absorb nearly all of the impact of these rate hikes since it would have been competitively devastating to increase end-user customer rates while the underlying carriers did not increase rates to their own end-user customers.

13.     The combined impact of unresolved billing disputes, failure by the powerful underlying carriers to honor contractual commitments and unilateral price increases by underlying carriers has forced the Debtor to file for Chapter 11 bankruptcy protection.

## II.     THE DEBTOR'S CAPITAL STRUCTURE[1]

### A.     Citizens' Claims.

14.     On May 15, 2007, the Debtor entered into a credit facility with Citizens, providing for up to $10 million in revolving credit.  The revolving credit facility has been used to provide ongoing working capital and for other general corporate purposes.

15.     The Debtor's credit facility with Citizens is evidenced by, among other things, a Revolving Line of Credit Agreement, dated May 15, 2007, as further amended (as amended, the "Credit Agreement").  The availability under the Credit Agreement is determined by the lesser of $10 million or 80% of the Debtor's eligible billed accounts receivable.  As of the Petition Date, the Debtor owed approximately $4,307,932 under the Credit Agreement.

---

[1] Except as set forth in the Proposed Cash Collateral Order, the Debtor has not determined the amount of any claims against it and/or the extent, priority or validity of any of the liens asserted against their respective assets, and reserves the right to challenge any claims and liens on any grounds.

16.     All of the Debtor's obligations under the Credit Agreement are secured by liens on all of the Debtor's business assets, including pledges of 100% of the stock in the Debtor.

17.     All loans under the Credit Agreement bear interest at a rate of the LIBOR Advantage Rate plus 3.5% with a default rate equal to the LIBOR Advantage Rate plus 5.5%.

**B.     Subordinated Loans.**

18.     On January 1, 1999, the Debtor entered into an Amended and Restated Revolving Credit Agreement with Trans National Group Services, LLC ("TNGS"), an affiliate of the Debtor.   In September 2011, TNGS advanced $1,140,000 to the Debtor in accordance with the terms of this agreement.   The loans bear interest at a rate of prime minus 2.5%. As of the Petition Date, the Debtor owed $1,142,401 to TNGS with respect to these loans.

19.     On October 6, 2010, the Debtor entered into a Subordinated Revolving Line of Credit Agreement with Charlesgate West Management, Inc. ("CWM"), an affiliate of the Debtor, providing for up to $2.1 million in revolving credit.   The Debtor's obligations under this revolving credit agreement are secured by liens on all of the Debtor's business assets, but are subject to a subordination agreement in favor of RBS Citizens, National Association.   This revolving credit facility has been used to provide ongoing working capital and for other general corporate purposes.   On October 6, 2010, CWM advanced $1,825,000 to the Debtor in accordance with this agreement.   On June 28, 2011, the Debtor and CWM amended this agreement, and CWM advanced an additional $275,000 under the amended agreement.   The loans accrue interest at a rate of 12%.   As of the Petition Date, the Debtor owed approximately $2,343,722.

20.     On June 28, 2011, the Debtor entered into a second Subordinated Revolving Line of Credit Agreement with CWM, providing for up to $2 million in revolving credit.   This second

revolving credit facility is secured by an identical subordinated lien as is the first CWM credit

facility. This revolving credit facility has been used to provide ongoing working capital and for

other general corporate purposes. On June 28, 2011, CWM advanced $2 million to the Debtor in

accordance with this agreement. The loan accrues an interest rate of 12%. As of the Petition

Date, the Debtor owed approximately $2,069,243.

### C.   Other Possible Secured Claims.

21.    The Debtor has various equipment leases with Maquarie Equipment Finance,

LLC, Cisco Systems Capital Corporation, De Lage Financial Services, Inc., Winthrop Resources

Corporation and RBS Asset Finance, Inc. (collectively the "Equipment Lessors") for equipment,

such as electronic switches, used to provide telecommunication services.

22.    Each of the Equipment Lessors has filed a UCC-1 financing statement to secure

its claims against the Debtor. The Debtor has not reviewed the Equipment Lessors' leases to

determine if they are disguised financing transactions, and reserves all of its rights in this respect.

### D.   Trade Debt and Other Obligations.

23.    As of the Petition Date and excluding inter-company and insider debt, the

Debtor's non-priority unsecured debt totaled approximately $14.2 million. Of this amount,

approximately $13.7 million consisted of trade debt and $482,000 consisted of other unsecured

obligations, such as lease obligations, accrued expenses and unsecured loan obligations.

24.    TNGS maintains a consolidated payroll for the Debtor and various of its affiliates.

Each of the Debtor and its affiliates are responsible for paying TNGS for the wages of the

employees who are dedicated to each of their respective businesses. No amounts are due for the

regular wages of the Debtor's employees for services rendered prior to the Petition Date.

25.    The Debtor maintains office space in a building owned by another affiliate and pays TNGS a market-based rent according to the square footage the Debtor occupies. The Debtor also obtains services and products from TNGS that are shared with various affiliates on a consolidated basis. Charges are allocated based on headcount (in the case of items such as benefit administration), square footage (in the case of items such as rent) and/or the specific nature of the charge (in the case of items such as insurance). The unpaid amount due to TNGS with respect to such charges for period since March 2011 equals approximately $655,000.

26.    The Debtor has 4,473 shares of Common Stock issued and outstanding, all of which are owned by S.B. Belkin.

## E.    Sales Agent Network.

27.    The Debtor's customer base and resulting billing revenue has been built over time based solely on sales generated by Independent Sales Agents. The Debtor has developed and currently maintains a sales network consisting of approximately 650 contractual relationships with Independent Sales Agents. Independent Sales Agents work directly with end-user businesses in an effort to sell the Debtor's services to such end-user businesses. Independent Sales Agents are responsible for establishing end-user customer relationships for the Debtor, generating and managing the execution of sales orders/contracts between end-user customers and the Debtor and managing the day-to-day relationship with end-user customers.

28.    In their role of providing direct, field-based sales and customer management support, Independent Sales Agents are the critical link between end-user customers and the Debtor. The Independent Sales Agent maintains the day-to-day relationship that ensures an ongoing alignment between end-user customer needs and services provided to the customer by

the Debtor. The Debtor relies exclusively upon these agent-customer relationships in order to both develop and maintain its monthly revenue and operating income.

29.     Relationships between the Debtor and its Independent Sales Agents are by necessity governed by non-exclusive contracts. This non-exclusive contractual relationship between the Debtor and its Independent Sales Agents makes it critically important that the Debtor work closely and extensively with each of its Independent Sales Agents on an ongoing and often daily basis.

30.     The Debtor compensates its Independent Sales Agents solely through the payment of monthly commission checks. The Debtor currently issues such monthly commission payments to approximately 300 Independent Sales Agents. The monthly commission paid by the Debtor to Independent Sales Agents is currently in excess of $700,000 (approximately $8,500,000 annually) and is provided in compensation for approximately $5,500,000 in monthly revenue or nearly $70,000,000 in annual the Debtor service revenue.

### III.   USE OF CASH COLLATERAL

#### A.   Requested Use of Cash Collateral.

31.     The Debtor requests the use of cash collateral, as that term is defined in Section 363(a) of the Bankruptcy Code (the "Cash Collateral") pursuant to the terms of the Proposed Cash Collateral Order.

32.     Attached as Exhibit B is a budget for the Debtor's operations (the "Budget") setting forth estimated receipts and disbursements for the period from October 9, 2011 through January 6, 2012 (the "Budget Period"). As the Budget demonstrates, the Debtor has sufficient Cash Collateral to fund its operations during the Budget Period.

33.     Except for the Debtor's share of the Consolidated Expenses and payroll to the Debtor's officers, no insider will receive any payments from the Debtor during the Budget Period.

34.     The approval of the use of the Cash Collateral on the terms set forth in the Proposed Cash Collateral Order is in the best interests of the Debtor, the Debtor's estate and its creditors.  The use of Cash Collateral will enable the Debtor to pay post-petition obligations, continue to provide voice and data communication services to its 18,000 customers and preserve the value of its assets.

35.     As a consequence of the Chapter 11 filing, the Debtor is unable to continue operating its business without using Citizens' and CWM's Cash Collateral.  Without the use of the Cash Collateral, the Debtor lacks the ability to pay expenses essential to the operations of its business.  Without the use of the Cash Collateral, the continued operation of the Debtor's business would not be possible, resulting in serious and irreparable harm to the Debtor.

**B.     Adequate Protection.**

36.     Section 363(e) of the Code provides that a party with an interest in property proposed to be used, sold or leased by the debtor must receive adequate protection for such interest before the debtor may use, sell or lease such property.  11 U.S.C. § 363(e).

37.     Section 361 of the Code provides that when adequate protection is required under Section 363 of the Code, such adequate protection may be provided by, *inter alia*, "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property."  11 U.S.C. § 361(2).

38.     The entitlement to and measure of the protection required is always determined by the extent of the anticipated or actual decrease, if any, in the value of the secured creditor's

collateral during course of the bankruptcy case. *See In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir.1987).

39.   Adequate protection requires only that the value of the creditor's interest in the cash collateral be protected from diminution while the Debtor is using the cash collateral. *United Savings Association of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988). Said another way, it is "intended by the Bankruptcy Code only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate." *In re Markos Gurnee Partnership*, 252 B.R. 712, 716 (Bankr.N.D.Ill.1997).

### C.   The Proposed Cash Collateral Order.

40.   It appears that Citizens is an oversecured creditor.  The Proposed Cash Collateral Order balances rights of such a creditor with the rights of a statutory committee or trustee that may be appointed, as well as any other party in interest with standing, with a reasonable period of time in which challenge Citizens' liens and claims.  CWM is provided with replacement liens that provide it with adequate protection for the Debtor's use of Cash Collateral.

41.   The Proposed Cash Collateral Order was negotiated at arms' length and in good faith by the Debtor, Citizens and CWM and represents the valid exercise of the Debtor's business judgment.

42.   The use of Cash Collateral pursuant to the terms of the Proposed Cash Collateral Order should therefore be granted.

### IV.   NOTICE

43.   Pursuant to MLBR 4001-2(b), the Debtor will serve this Motion on (a) the Secured Creditors, (b) any taxing authority that has a claim against the estates, (c) the 20 largest

unsecured creditors of each Debtor, (e) the Office of the United States Trustee, and (f) all parties

who have filed a notice of appearance in these cases.  The Debtor believes that such service

provides sufficient notice in light of the nature of the relief requested and request that the Court

approve such notice.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order,

substantially in the form attached as <u>Exhibit A</u>:

A.   Approving the notice of this motion as described above;

B.   Authorizing the Debtor to use Cash Collateral on an emergency basis, pursuant to the terms of the Proposed Cash Collateral Order, pending the scheduling of a hearing on the continuing use of Cash Collateral;

C.   Authorizing the Debtor to use Cash Collateral, pursuant to the terms of the Proposed Cash Collateral Order, on a continuing basis in an amount necessary to conduct ordinary business operations;

D.   Granting the Secured Creditors replacement liens in accordance with the terms of this Motion;

E.   Granting such other relief as is just and proper.

Respectfully Submitted,

TRANS NATIONAL
COMMUNICATIONS INTERNATIONAL,
INC.,
By its proposed counsel,


/s/ *D. Ethan Jeffery*
Harold B. Murphy (BBO #362610)
D. Ethan Jeffery (BBO #631941)
Natalie B. Sawyer (BBO #660072)
HANIFY & KING, P.C.
One Beacon Street
Boston, MA  02108-3107
Tel: (617) 423-0400
Fax: (617) 556-8985
dej@hanify.com

Dated:  October 11, 2011
608464