UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

=======================================
                                        )
In re:                                  )         Chapter 11
    TRANS NATIONAL COMMUNICATIONS    )         No.  11-19595–WCH
    INTERNATIONAL, INC.,                )
                          Debtor  )
                                        )
=======================================

DECISION ON APPLICATION OF DEBTOR AND
DEBTOR-IN-POSSESSION TO EMPLOY
Q ADVISORS AS INVESTMENT BANKER

Trans National Communications International, Inc. ("Debtor") has applied to the Court for authority to retain Q Advisors "as investment banker in connection with marketing the Debtor's business operations."[1] The Official Committee of Unsecured Creditors (the "Committee") objected.[2] I held a hearing on December 7, 2011, and took the application under advisement.

*Background*

Debtor describes itself as "a telecommunications reseller" and describes its business as follows:

> Debtor provides local and long distance phone services as well as data communication services (primarily viewed as telephone and internet services) to small and medium sized businesses throughout the United States. In order to effectively deliver such services, the Debtor purchases services in high volume from larger telecom network carriers such as Sprint, Qwest (Century Link), AT&T, Verizon and numerous others (collectively, "underlying carriers") and engineers solutions utilizing the services of one or more of these underlying carriers in order to provide

---

[1] Docket No. 198.
[2] Docket No. 238.

1

individual end-user customers with competitive solutions to meet their communications services needs. The Debtor supports the processing of over 150+ million phone calls each month and provides voice and data communication services for over 18,000 customers' service connections, issuing monthly invoices for approximately 25,000 billing locations.[3]

Debtor filed voluntary petition under Chapter 11 on October 9, 2011.

*Prior Professional Engagements*

In aid of its efforts to reorganize, Debtor sought and obtained my authorization to retain a variety of professionals:

*Murphy & King, Professional Corporation*

Debtor sought and obtained authority to retain Murphy & King, Professional Corporation ("M&K") as counsel to the debtor and debtor-in-possession.[4] The services for which M&K's assistance was requested were "including, without limitation":[5]

   i. Advising the Debtor with respect to its rights, powers and duties as a debtor-in-possession in the continued operation of its business and management of its assets;
   ii. Advising he Debtor with respect to any plan of reorganization and any other matters relevant to the formulation and negotiation of a plan or plans of reorganization in the case;
   iii. Representing the Debtor at all hearings and matters pertaining to its affairs as a debtor and debtor-in-possession'
   iv. Preparing, on the Debtor's behalf, all necessary and appropriate applications, motions, answers, orders, reports, and other pleadings and other documents, and reviewing all financial and other reports filed in this Chapter 11 case;
   v. Advising the Debtor with respect to, and assisting in the negotiation and documentation of, financing agreements, debt and cash collateral orders and related transactions;
   vi. Reviewing and analyzing the nature and validity of any liens asserted against the Debtor's property and advising the Debtor concerning the enforceability of such liens;

---

[3] Docket No. 198, ¶6.
[4] Docket No. 51 (Application); No. 201 (Order).
[5] I confess that I do not fully comprehend what "without limitation" means in this context, and it would have been wiser if I had raised that issue at the hearing on the application. I will assume that it means matters related to those specified, within the bounds of *ejusdem generis.*

2

vii. Advising the Debtor regarding its ability to initiate actions to collect and recover property for the benefit of its estate;
viii. Advising and assisting the Debtor in connection with the potential disposition of any property;
ix. Advising the Debtor concerning executory contract and unexpired lease assumptions, lease assignments, rejections, restructurings and recharacterization of contracts and leases;
x. Reviewing and analyzing the claims of the Debtor's creditors, the treatment of such claims and the preparation, filing or prosecution of any objections to claims;
xi. Commencing and conducting any and all litigation necessary or appropriate to assert rights held by the Debtor, protect assets of the Debtor's Chapter 11 estate or otherwise further the goal on completing the Debtor's successful reorganization; and
xii. Performing all other legal services and providing all other necessary legal advice to the Debtor as debtor-in-possession which may be necessary in the Debtor's bankruptcy proceeding.[6]

In furtherance of its employment M&K undertook to "maintain detailed, contemporaneous records of time and any actual and necessary expenses incurred in connection with the rendering of the legal services described above by category and nature of services rendered,"[7] and acknowledged that "any reimbursement of compensation and expenses shall be subject to allowance by this Court upon appropriate application pursuant to Sections 330 and 331 of the Bankruptcy Code and any orders of this Court."[8]

*Verdolino & Lowey, P.C.*

Debtor sought and obtained authority to retain Verdolino & Lowey, P.C. ("V&L") as financial advisors to the debtor and debtor-in-possession.[9] The services for which V&L's assistance was requested were (once again) "including, without limitation":

a. Consulting with the Debtor and its counsel with respect to the development and implementation of a plan to reorganize the Debtor's business operations;

---

[6] Docket No. 51, ¶ 12.
[7] *Id.*, ¶ 15.
[8] *Id.*, ¶ 16. The detailed contents of the application are set forth in MLBR 2016-1.
[9] Docket No. 53 (Application); No. 202 (Order).

3

b. Preparing or coordinating the preparation of such other analyses and reports as may be requested or required by the Debtor, the Court, the Debtor's secured creditors, and any official committees appointed in this Chapter 11 case;
c. Performing or coordinating the performance of an analysis of potential avoidance actions under Chapter 5 of the Bankruptcy Code;
d. Preparing or coordinating the preparation of schedules and [sic] assets and liabilities of the Debtor as required by the Bankruptcy Code and Bankruptcy Rules;
e. Preparing or coordinating the preparation of monthly operating reports and such other reports and information as may be required or requested by the Bankruptcy Code and Bankruptcy Rules for use by the United States Trustee;
f. Advising the Debtor's senior management with respect to the performance of the business and recommending actions to improve the value of the Debtor's assets;
g. Assisting in any negotiations with creditors; and
h. Performing such other professional services as may be requested by the Debtor in order to facilitate the Debtor's reorganization.[10]

Provisions of this application parallel those of the M&K application as to the maintenance of time records and allowance of compensation.[11]

*Mintz Levin Cohn Ferris Glovsky and Popeo PC*

Debtor sought and obtained authority to retain Mintz Levin Cohn Ferris Glovsky and Popeo PC ("Mintz Levin") as special telecommunications counsel to the debtor and debtor-in-possession.[12] The services sought were

> [R]elated to telecommunications issues which arise in this matter, including, but not limited to, regulatory matters, telecommunications-related litigation issues, telecommunications-related negotiations, telecommunications-related transactional matters, and representation on telecommunications-related commercial agreements with Debtor's vendors and suppliers and such other and further matters as may arise in the Chapter 11 proceedings that relate to telecommunications issues.[13]

---

[10] Docket No. 53, ¶ 8.
[11] *Id.*, ¶¶ 10,11.
[12] Docket No. 52 (Application); No. 247 (Order).
[13] Docket No. 52, ¶ 7.

4

Provisions of this application parallel those of the M&K and V&L applications as to the maintenance of time records and allowance of compensation.[14]

*The Staten Group and Bruce E. Rogoff*

Debtor sought and obtained authority to retain The Staten Group ("Staten") and Bruce E. Rogoff ("Rogoff") as chief restructuring officer and advisor.[15] Other than disclosing that it holds a security retainer, the record keeping and allowance of compensation provisions parallel the previously described applications.[16]

*The Q Advisors Application*

Debtor filed the application presently under consideration seeking the employment of Q Advisors as an investment banker.[17] The application seeks an order "pursuant to Section 327 of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and MLBR 2014-1 authorizing the Debtor to retain Q Advisors as investment banker in connection with marketing the Debtor's business operations…."[18]

Debtor has some history with Q Advisors, having retained it in July, 2011, "to evaluate strategic and financial alternatives."[19] It now seeks to employ Q Advisors to perform the following services:

a. Prepare an Information Memorandum or other suitable materials for use in informing prospective partners or investors about the Debtor's business;
b. Advise and assist the Debtor in preparation of a presentation which will be given by management to selected qualified prospective parties;
c. Develop a plan for marketing the Debtor's business;
d. Assist in the negotiation of a sale transaction;
e. Advise the Debtor of the financial aspects of any proposed transaction; and

---

[14] *Id.*, ¶¶ 9, 10.
[15] Docket No. 85 (Application); No. 206 (Order).
[16] Docket No. 85, ¶¶ 10, 11.
[17] Application of the Debtor and Debtor-in-Possession to Employ Q Advisors as Investment Banker, Docket No. 198.
[18] *Ibid*.
[19] *Id.*, ¶ 8. For those services Q Advisors was paid $30,000.00, which Debtor states was fully earned prepetition. Q Advisors has agreed to apply 50% of that amount to any Transaction Fee earned.

    f.  Work with legal counsel, as appropriate, on any letter of intent or definitive agreement and [sic] until the sale transaction is completed.[20]

The compensation proposed to be paid to Q Advisors consists of two elements, a monthly fee of $10,000, with a cap of $50,000; and a "Transaction Fee," earned on "consummation of a Sale Transaction with the potential purchaser who has been introduced by Q Advisors" of 2.5% of the first $30 million dollars and 4.5% of amounts over $30 million.[21] The minimum fee shall be $400,000.

As to the monthly fee, Debtor asserts that "[a]s Q Advisors does not bill on an hourly basis, nor maintain a system to record time, Q Advisors should not be required to submit detailed time records in support of payment of the compensation as set forth in the Engagement Letter."[22]

The Creditors' Committee has objected to the application to employ Q Advisors.[23] In summary it asserts that Debtor has not demonstrated that the proposed terms are reasonable;[24] urges that the employment should be subject to § 330 of the Bankruptcy Code;[25] and that the indemnification provision (discussed below) should be deleted.[26]

*Discussion*

*Manner and Amount of Proposed Compensation*

The employment of financial consultants or investment bankers has been the subject of some attention in this District. The tension arises because bankruptcy professionals were traditionally retained with reasonable compensation being

---

[20] *Id.*, ¶ 9.
[21] *Id.*, ¶ 12.
[22] *Id.*, ¶ 18.
[23] Docket No. 238.
[24] *Id.*, ¶¶ 16-18.
[25] *Id.*, ¶¶ 19-24.
[26] *Id.*, ¶¶ 25-26.

6

determined by the Court under § 330 after services were rendered.[27] The application before me would have Q Advisors retained at the specified fees, under § 328(a), which permits employment of professional persons "on any reasonable terms and conditions of employment."[28] This would exempt them from the detailed time and services accounting required of most professionals, and indicated in the previous applications approved in this case.

It was almost twenty years ago that I examined this issue in *In re Wang Laboratories, Inc,*[29] setting the stage for close scrutiny of such hirings:

> The recent gravitation of investment bankers/advisors to "the big" Chapter 11 cases has generated a growing trend of disfavor among bankruptcy judges. Judge Paskay wrote: "This court is not unaware that the world of investment banking is indeed a strange, but wonderful place where a large amount of money is spent, generally at the expense of debtors in Chapter 11." Judge Conrad opined: "Whenever we have dealt with investment bankers and financial advisors we have been left with the strong impression that for them the debtor is the cash cow to be milked, Chapter 11 the milking parlor, and the Judge the milking stool."[30]

I concluded that the services which the consultants would provide were largely duplicative of those of professionals already engaged and denied the application.

Judge Feeney's exhaustive opinion in *High Voltage Engineering Corp.* also dealt with an application to employ a financial advisor under § 328(a).[31] The advisor would be paid a monthly advisory fee, which would be credited against other fees subsequently earned. As in the present application, the prospective advisor had been employed and compensated for services rendered prepetition.

Judge Feeney reviewed the case law and summarized:

---

[27] 11 U.S.C. § 330.
[28] 11 U.S.C. § 328(a).
[29] 143 B.R. 794 (Bankr. D. Mass. 1992).
[30] *Id.* at 796 (citations omitted).
[31] 311 B.R. 320 (Bankr. D. Mass. 2004).

7

> Two conclusions can be drawn from the growing body of case law construing § 328(a). The first is that a bankruptcy court has an obligation to determine the reasonableness of terms and conditions before authorizing the employment of professionals under § 328(a) and may eliminate, modify, or impose additional terms and conditions to satisfy the requirement of reasonableness. The second is that, once approved, the terms and conditions cannot be modified without a finding that they were improvident. Thus, the trustee or committee seeking the employment of professionals under § 328(a) must establish that the terms and conditions of employment are reasonable, and evidence, not conclusory statements, is required to satisfy that burden.[32]

She then quoted with approval the criteria adopted by Judge Conrad in making the threshold determination of reasonableness:

> Any investment banker/advisor retention application submitted to this court must present the scope and complexity of the assignment, its anticipated duration, expected results, required resources, the extent to which highly specialized skills may be needed and the extent to which they have them or may have to obtain them, projected salaries of participating professionals, billing rates and prevailing fees for comparable engagements, current retentions in bankruptcy by the retained firm, and any estimated lost opportunity costs due to time exigencies of the job. In addition, the actual retention agreement between the investment banker/advisor and the client must be attached to the retention application and, the party retaining the professional must describe the process by which the financial banker/advisor has been selected. This latter requirement is aimed specifically at offsetting what we perceive as a lack of competitiveness in the selection process. Finally, the application must explain how the investment banker/advisor will eliminate, or at least reduce, the duplication of effort Judge Paskay alluded to . . ., where there are armies of professionals apparently doing the same thing as the investment banker/advisor. Specifically, the intention is to avoid accountants ad investment bankers/advisors massaging the same numbers twice when one trip to the masseuse would generally suffice. We liken our requirements to a financial impact statement on the estate. Only with an advance picture of the job to be accomplished will we be able to measure the results (or lack thereof) achieved.[33]

Certainly there are times when retention of a professional at a pre-agreed fee is appropriate. Probably the most common example is when special counsel is employed

---

[32] *Id.* at 333.
[33] *Id*. at 333-334, quoting *In re* Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 27 (Bankr. S.D. N.Y. 1991).

to litigate a tort claim on an agreed percentage basis. But, except for proposed services by Q Advisors which appear to be duplicative of those expected of already-employed professionals, Q Advisors is merely acting as a broker. I appreciate that Debtor wants Q Advisors to assist it in determining whether it should restructure or sell the company.[34] However, to the extent that it seeks Q Advisors to assist it in considering restructuring, the services duplicate those of other professionals.

Brokers do not normally receive compensation in advance of delivering a buyer ready, willing, and able to purchase. The fact that investment bankers are really brokers under another name is recognized by our local rules:

> Any professional seeking interim or final compensation for services and reimbursement of expenses under 11 U.S.C. §§ 330, 331, 503(b)(2), 503(b)(4) or 506(b), excluding any broker (*other than an investment banker*) whose compensation is determined by a commission on the sale price of an asset, shall file an application for compensation and reimbursement. The application shall conform generally to Fed. R. Bankr. P. 2016.[35]

Our local rule is even more particular than the federal rule in specifying the detail required of the compensation applicant. The present application, although it does not mention the local rule, actually seeks an exception to the exception.

At the hearing, Debtor explained that it had interviewed four investment advisors and had determined to hire Q Advisors based upon "three primary factors":

> The first was their experience in the telecom industry because they are an investment banker that has experience in the telecom industry.
>
> The second was the fee structure. Of the investment bankers that were interviewed who have experience in the telecom industry, they had the lowest fee structure.

---

[34] Transcript of hearing held December 7, 2011 ("Trans."), p. 8, line 24*ff*.
[35] MLBR 2016-1(a) (emphasis added).

>The third was the fact that Q Advisors had done work with the debtor prepetition and, therefore, had institutional knowledge about the debtor, its workings, its financial and capital structure that a new investment banker would not [sic] have to learn anew.[36]

Debtor makes no effort to supply the detailed information required by Judges Conrad and Feeney. I have no doubt that Q Advisors has experience in the industry and I note its prior connection with Debtor. As to it being the cheapest game in town, I find this a dubious basis for hiring a professional. The English essayist John Ruskin is attributed with this remark:

>There is scarcely anything in the world that some man cannot make a little worse, and sell a little more cheaply. The person who buys on price alone is this man's lawful prey.[37]

While price is not the sole criterion used by Debtor in selecting Q Advisors, it is certainly a major one.[38] And I am not certain that it will necessarily be that inexpensive. As the Committee correctly points out:

>It should be noted that the minimum fee sought by Q Advisors is $400,000. That means that the debtor would have to sell its assets for 16 million in order for Q Advisors to earn the minimum fee. Anything below 16 million, the minimum fee provision kicks in. There has been no valuation of the company so it is unclear of [sic] what the company would sell for.[39]

I appreciate that I have the authority to approve the application on terms other than those proposed---I "may approve the employment of a professional on any terms any conditions that the Court finds necessary to satisfy the requirements of

---

[36] *Id*. at p. 9, lines 14-24.
[37] This can be found in any number of collections.
[38] The United States Trustee points out that Q Advisors' minimum fee was "at least $150,000 less than all of the minimum fees required by the other investment bankers that . . . were interviewed." Trans. P. 18, lines 5-7.
[39] Trans., p. 16, lines 13-18.

10

reasonableness."[40]  However, in view of the absence of any valuation information, I decline to exercise that power.  An appropriate application, satisfying the requirements indicated above, would allow me to make an informed decision on compensation, which I cannot do at this point.

*The Indemnity Provision*

The proposed engagement letter contains an elaborate indemnification provision.[41]  Under it, Debtor agrees to indemnify Q Advisors from damages or liabilities "other than the breach of a material representation, warranty or covenant of Q Advisors or the gross negligence or willful misconduct by [Q Advisors and its employees]."[42]  The Committee objected, asserting that Q Advisors is a professional and should be held to the same standards as other professionals.[43]  The United States Trustee asserts that such provisions are standard and no investment banker will come on board without it.[44]

I would be more concerned about this provision if I were prepared to allow the employment of Q Advisors in a more expansive capacity.  However, as mere brokers, the provision does not harm.

---

[40] Committee of Equity Security Holders v. Official Committee of Unsecured Creditors (*In re* Federal Mogul-Global, Inc.), 348 F.3d 390, 397 (3rd Cir. 2003).
[41] Docket No. 198, Ex. A., ¶ 5.
[42] *Ibid*.
[43] Trans. P. 16, lines 21-25.
[44] Trans. P. 18, lines 9-20.

*Conclusion*

The application to retain Q Advisors is denied without prejudice.

 

_____
William C. Hillman
United States Bankruptcy Judge

December 27, 2011

Counsel Appearing:

    Christopher M. Condon, D. Ethan Jeffery, Harold B. Murphy, Natalie B. Sawyer,
        Murphy & King, P.C., Boston, MA,
        for the Debtor
    Anthony L. Gray, Pollack & Flanders, LLP, Boston, MA,
        for the Official Committee of Unsecured Creditors
    Kenneth M. Misken, Miles & Stockbridge, P.C., Tysons Corner, VA
        for the Official Committee of Unsecured Creditors
    Jennifer L. Hertz, Office of the United States Trustee, Boston, MA,
        for the United States Trustee